434 So.2d 1110 (1983)
STATE of Louisiana
v.
Kim P. KOHLER.
No. 82 KA 1020.
Court of Appeal of Louisiana, First Circuit.
May 17, 1983.
*1114 William R. Alford, Asst. Dist. Atty., Covington, for the State.
Salvatore Panzeca, Suzette Powers, New Orleans, for defendant.
Before COVINGTON, LANIER and ALFORD, JJ.
ALFORD, Judge.
Defendant, Kim P. Kohler, was indicted by the St. Tammany Parish Grand Jury on August 21, 1980, for the July 31, 1980, first degree murder of Randy Sebble. (La.R.S. 14:30) On November 10 and 11, 1981, defendant was tried and an unanimous jury returned a verdict of guilty as charged. After the sentencing phase of the bifurcated trial, the jury unanimously recommended that defendant be sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. In accordance with this recommendation, on December 17, 1981, the trial judge sentenced the defendant to serve a period of life imprisonment at hard labor under the Department of Corrections without benefit of parole, probation or suspension of sentence. Defendant urges eighteen assignments of error on appeal. However, prior to addressing those alleged errors, the court will confront two preliminary matters; one evident on the face of the record and the other raised in defendant's brief on appeal.
The record discloses that defendant entered a combined plea of not guilty and not guilty by reason of insanity to the charge of first degree murder. La.C.Cr.P. art. 552. Counsel was given 30 days to file special pleadings. Apparently, no further action was taken in this respect as nothing is contained in the record relative to defendant's plea. The law is clear that a defendant is not entitled of right to an examination and evaluation of his sanity at the time of the offense. The necessity of appointing a commission for such a purpose lies within the sound discretion of the trial judge. La.C.Cr.P. art. 650; State v. Taylor, 347 So.2d 172 (La.1977). The accused bears the burden of establishing by a clear preponderance of the evidence reasonable grounds for the judge to believe that he is mentally defective, or was at the time of the offense. Where no supporting evidence is produced, there is no compulsion upon the court to appoint a sanity commission. State v. Crawford, 410 So.2d 1076 (La.1982). Thus, it should be clear that although the defendant raised the question of sanity in his plea, nevertheless the extent of Kohler's ability to form a criminal mens rea at the time of the offense is not presently before the court.
The second preliminary matter relates to the jurisdiction of the court. Although he neither briefs the issue nor refers the court to any statutory or jurisprudential authority, nevertheless, in that portion of defendant's brief concerning the jurisdiction of the court, defendant posits the argument that jurisdiction of this appeal should be vested in the Louisiana Supreme Court rather than this court because defendant was convicted prior to the date criminal jurisdiction was *1115 conferred on the appellate courts of Louisiana.
Without exploring the legal mechanics of this appeal in detail, suffice it to say that after defendant's motion for a new trial was denied on December 17, 1981, defendant elected not to pursue anymore avenues of relief. Indeed, the record reflects that defendant wrote the trial judge personally and waived his appeal. Defendant's trial counsel withdrew from the case on January 25, 1982, but was reenrolled as counsel of record on May 4, 1982. On the same day (May 4, 1982), defendant filed a motion to appeal. This motion was denied by the trial judge on May 13, 1982.
Subsequently, on July 2, 1982, the Supreme Court granted a writ of mandamus ordering an out-of-time appeal. State ex rel. Kohler v. 22nd Judicial District Court, St. Tammany Parish, 417 So.2d 360 (La. 1982). Pursuant to the writ, on July 30, 1982, and again on September 27, 1982, defendant filed a petition for appeal. Finally, on September 27, 1982, the trial judge signed an order granting defendant's petition for appeal.
Effective July 1, 1982, the Courts of Appeal in Louisiana were given appellate jurisdiction over all criminal cases triable by a jury, excepting those cases where the defendant has been convicted of a capital offense and a penalty of death actually has been imposed. La. Const. of 1974, art. V, § 10(A) and art. V, § 5(D). However, La. Const. of 1974, art. V, § 5(E) specifically provides that where an order of appeal had been entered prior to July 1, 1982, the Supreme Court would retain its jurisdiction over the case as previously mandated by the Constitution. Thus, the legislature intended the date of the filing of an order of appeal to be the operative date. In other words, if a defendant filed an order of appeal prior to July 1, 1982, the Supreme Court would retain jurisdiction over the appeal; a contrario sensu, where an appeal is entered on or after July 1, 1982, the respective Court of Appeal would have jurisdiction over the case as noted above. 1980 La.Acts, No. 843. Since defendant's "petition" for appeal was not entered until after July 1, 1982, this court has jurisdiction over the appeal and defendant's assertion otherwise is rejected.
Having dispensed with the above two preliminary matters, the court will address the arguments presented by defendant's assignments of error after a recitation of the facts found in the record. On the morning of July 31, 1980, Vincent Allnet was upset over the alleged theft of some jewelry he owned. Thinking he knew who stole the jewelry, Allnet and his nephew Owen Meilleur, who was living with Allnet at the time, rode around the neighborhood looking for one Randy Sebble. Although the travellers sojourned at various houses and barrooms, they were unable to locate Sebble.
Later in the morning, after Vincent and Owen returned home, Randy came over and Allnet immediately began questioning him relative to the alleged theft. Worked up in a fury over the loss of the property, Allnet initiated a fight with Sebble. After several minutes it was obvious Allnet was getting the upper hand on Sebble as the latter was thrown and rammed against the wall of the room. In a vain effort to protect Sebble from any further harm, Meilleur attempted to stop the beating Allnet was administering to Randy. However, immediately after Owen stepped into the action attempting to end the fracas, Allnet yelled at Owen that the latter had also stolen the jewelry. Vincent then turned on Owen and commenced giving Meilleur the same brutal treatment that he had given Randy.
His mind clouded by the emotion of the fight and the beating he sustained, Owen fell into unconsciousness. The next thing Meilleur remembered was waking up about 6:00 p.m. in his cousin's room in the upstairs portion of the house. Randy Sebble was nowhere to be found.
On the advice of Allnet, who had subsequently apologized for the altercation, Owen called his cousin Robert to request a ride to the Showboat Lounge in "Fat City" where another of Owen's cousins, Rita, was performing.
After giving him a lift to the Showboat Lounge, Robert dropped Owen off and apparently *1116 left the scene. As Owen approached the entrance to the lounge, he spotted his uncle's car in the parking lot. By the time Owen realized several occupants were in the car, he heard Vincent call out ordering him into the auto. Remembering the alleged theft of the jewelry and fearing for his safety, Owen attempted to flee. One of the occupants of the car, Floyd Webb, leaped from the auto and gave chase to Owen. Catching him a short distance later, Webb forced Owen to return to Vincent's car and then threw Meilleur into the vehicle. After he was settled in, Owen recognized the occupants of the car: Vincent Allnet, the driver; Kim Kohler, the defendant; Floyd Webb; Richard Allnet; and finally, Randy Sebble.
At trial, Owen testified that in addition to being commanded to either surrender the jewelry "or else", he was also beaten during the car ride by everyone except Randy and Vincent (who was driving). Owen specifically testified that Kohler took part in the physical assaults. Leaving the "Fat City" area and heading eastward, the car was driven along the Chef Menteur Highway. Later, after driving for quite awhile, Vincent stopped the car at a Seven-Eleven for some beer.
At this point, Owen attempted to escape from the auto hoping to catch the attention of a police unit parked at the convenience store. Although he struggled to break free, Owen was checked by Richard Allnet and the defendant who forced Owen's face into the seat in order to muffle his cries for help. Thus restrained and defeated in his fight for liberty, Owen waited as the others returned to the car. Vincent then resumed the journey eastward toward Slidell.
During the ride, Owen's life was threatened many times. Informed it was his last chance, Owen was told to either "spill the beans" and tell his captors the location of the jewelry or "that was it". The car continued on the Chef Menteur Highway toward "The Rigolets" until reaching a dark and deserted area. Turning off the main highway onto a lonely and secluded side road, Vincent stopped the car and everyone got out except Owen, who was too frightened to leave the vehicle. Owen was grabbed and dragged out of the car by Floyd Webb and Richard Allnet. In the interim, Kohler and Vincent Allnet were keeping a guarded watch over Randy Sebble, preventing his flight from the scene.
Once the malefactors succeeded in removing Owen from the car, Meilleur was led to the front of the vehicle. At this point, the malefactors pounced on Randy and Owen and began to beat them up again. Subsequent to the beatings, Floyd Webb drew a gun and started shooting the ground at the victim's feet. While Randy and Owen were scurrying to avoid being shot by Webb, the two Allnets and Kohler continued to tormet and ridicule them.
Apparently running out of ammunition, but continuing the brutality with alacrity, Webb ceased firing, grabbed Owen and then delivered a vicious kick to the genitals. Owen fell to the ground in agony. It was at this point that Vincent and Richard Allnet armed themselves with shotguns previously hidden in the trunk. Walking over to the bruised Meilleur, Vincent directed Richard to shoot Owen. When Richard responded, "Are you serious?", Vincent replied, "I'll show you how serious I am," and fired at Owen hitting him in the side. Although he was stunned, bleeding and bruised from the repeated assaults he had been subjected to, Owen did not lose consciousness.
After witnessing the shooting of Owen and in a violent reaction, Randy yelled at Vincent, "You done it. You really done it." Floyd Webb then turned on Randy and fired a single shot into Sebble's chest. Entering two inches above the right nipple, the bullet traversed in a right to left direction inside Randy's torso coming to rest on the left side of the body under the skin of the back. Passing through the major vessels of both lungs, and also puncturing the aorta, the coroner testified that the bullet caused such internal bleeding that Randy died within two minutes of the initial penetration of the bullet.
The villains then fled the scene in the opposite direction from whence they came. After remaining motionless for a few minutes, certainly stunned by the entire ordeal, *1117 Owen called out to Randy. No answer was forthcoming. Unable to move his legs and bleeding from his side, Meilleur attempted to crawl back to the main highway. Upon reaching the halfway point, Owen detected the car coming back to the scene of the crime. Frightened when he heard Vincent command, "See if they're dead," Owen thrust his face into what turned out to be an ant pile and held still.
Kim Kohler, the defendant, got out of the car and walked over to Randy. After kicking him, Kohler barked, "The nigger's dead!" Similarly, Kohler proceeded to the spot where Owen lay wounded, kicked him also, and once again exclaimed, "He's dead." Owen testified that he had no doubt whatsoever about the identity of the person who got out of the car to check on the condition of the victims. Owen reported he was sure it was Kohler for two reasons: first, because Owen was familiar with Kohler's voice, and second, because Kohler was the only person wearing "flip-flop" shoes.
After the others fled the scene a second time, Owen crawled to the highway where a motorist rescued him some time later. Following notification, the police arrived on the scene, secured the evidence, and pronounced Randy dead. After trial on the merits, Kim Kohler was found guilty as charged and sentenced to life imprisonment. Defendant posits eighteen assignments of error on appeal. For convenience sake, we shall dispense with the assignments in the manner suggested by the format of defendant's brief. The first eight assignments deal with the question of whether defendant was denied his right to a fair and impartial jury.
Assignment of Error No. 1
By this assignment, defense counsel argues that the trial court erred in excusing a juror sua sponte, thus denying defendant the right to a full voir dire examination. Although the prospective juror, one Mr. Perilloux, appeared antagonistic and highly prejudicial to the defense, apparently it is defense counsel's position that the trial judge committed reversible error by not permitting any questioning of Mr. Perilloux by either the state or the defense.
Louisiana Code of Criminal Procedure article 787 states:
The court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case. (emphasis supplied)
The official comment to this provision acknowledges that the article is very broad, but asserts the provision is essential to give the court a wide latitude to determine jurors' qualifications in the particular situation of each case. Moreover, this article should be read in pari materia with La.C.Cr.P. articles 797 and 798 which set forth grounds upon which a juror may be challenged for cause.
As envisioned by the latter two articles, a challenge to a juror is only available to the state or defense counsel. Thus in order for the trial judge to protect the proceedings from potential error, it is necessary to give the presiding judge the authority to disqualify. In furtherance of this policy, by article 787, the legislature has conferred upon the judge the power to examine the jurors and necessarily to disqualify one when, "for any reason", doubt is cast upon the jurors ability to serve.
That portion of the examination of Mr. Perilloux quoted in defendant's brief paints an incomplete picture of the situation. A complete reading of the court's examination of the prospective juror demonstrates that the court was endeavoring to protect the interest of the defendant and ultimately, the judicial process. Mr. Perilloux plainly stated he could not render a fair verdict in the case. He admitted to a preconceived prejudice against the defendant in all murder cases. Clearly, this is precisely the situation encompassed by the intent and letter of the above cited procedural articles. In State v. St. Andre, 263 La. 48, 267 So.2d 190 (1972), the Supreme Court upheld the excusal of a prospective juror by a trial court, ex proprio motu, under the authority vested in it through article 787.
*1118 Thus, it is well-settled that the scope of voir dire examination is within the trial judge's discretion and his ruling will not be disturbed in the absence of a clear abuse of that discretion. Finally, in evaluating the fairness of the ruling, the entire examination must be considered. State v. Stucke, 419 So.2d 939 (La.1982); State v. Davis, 411 So.2d 2 (La.1982); State v. Robinson, 404 So.2d 907 (La.1981). When so examined, it is abundantly clear that the actions of the trial judge were completely justified. Consequently, this assignment of error lacks merit.
Assignment of Error No. 2
By this assignment, the defendant claims the trial court erred in allowing the state to make an incorrect statement of the law on principals on voir dire. Defendant argues that the jurors were misled by the hypothetical situations propounded by the district attorney.
Our review of the record indicates that the prosecution's hypothets erroneously omitted necessary antecedents relative to the importance of specific intent in his hypothetical situations. During voir dire examination the prosecutor attempted to explain the law in Louisiana on principals (La.R.S. 14:24) by means of hypothetical situations. The state posited two hypothetical predicaments both involving the ubiquitous getaway driver. The first situation was described as follows:
So, for example, and this is the classic example that, I guess, every prosecutor gives to the prospective jurors, and that is the situation of the armed robbery. One guy is driving the getaway car, driving the car. Two other people or one other person goes in to the Seven-Eleven and they rob thethe guy robs the store; runs out; jumps in the car and they get away. Under the law that I've just read to you, the person seated in the car could come in to court and say, "Wait a minute. I didn't rob anybody." And that would technically be true from the standpoint he didn't walk into the store and put a gun on somebody and take the money. But under the law of principals, he would be equally guilty with the robber because he aided and abetted, counseled or procured in the commission of the crime.
The district attorney then took the hypothet one step further:
To take my example one step further of the person who is driving the getaway car, his friend or his cohort goes into the Seven-Eleven to rob the store, and in the course of the robbery he kills the clerk. Under the law of principals, if the State can prove beyond a reasonable doubt that he aided and abetted and proves his part in the activity, driving the car, even though he could come in and say factually "I didn't go in the store and I didn't pull the trigger," would all of you agree under the law of principals that this person could likewise be guilty of the crime of murder?
It is here that the district attorney erred. According to La.R.S. 14:24, principals include:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime...
In State v. Holmes, 388 So.2d 722, 726 (La. 1980) appears the following:
However, under R.S. 14:24, not all principals are automatically guilty of the same grade of offense. One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. McAllister, 366 So.2d 1340 (La. 1978). Thus, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. In the case of a first degree murder conviction, the requisite mental state is that the defendant had the specific intent to kill. It is not enough to find merely that his coconspirator or accomplice had the necessary mental state, since this intent cannot be inferred to the accused. It must be *1119 shown that this accused also had the specific intent to kill.
Specific intent is present when from the circumstances the offender must have subjectively desired the prohibited result. La. R.S. 14:10(1); State v. Daniels, 236 La. 998, 109 So.2d 896 (1958), overruled on other grounds by State v. Gatlin, 241 La. 321, 129 So.2d 4 (1961). Accord State v. Johnson, 368 So.2d 719 (La.1979). Because the second hypothetical situation formulated by the district attorney did not adequately explain the necessary mental state of the defendant which the state must demonstrate, the jury may have been left with a misconception of the law, and consequently, the prosecutor's hypothet was improper. However, improper statements of the law during voir dire do not always require a reversal. Holmes, 388 So.2d at 727; State v. Burge, 362 So.2d 1371 (La.1978).
The court believes that the error on voir dire is remedied by three factors: (1) Immediately prior to the second hypothetical given to the jurors, the district attorney advised the jurors that what he said was merely an opinion. The prosecutor continued:
You are and you remain under an obligation that you've just agreed to, and that is that you will take the law that's given to you by the Court at the conclusion of the trial.
(2) Immediately after the state's second hypothet, and as a response to defense counsel's objection, the trial judge admonished the jury:
The panel is instructed that the Court will instruct you what the law of principals is, and then you will decide from the facts whether that law applies.
(3) Most importantly, the trial court gave the following correct instruction on the law of principals and the necessity for the proof of specific intent:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the crime, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime, are principals and are guilty of the crime charged.
An individual may only be convicted as a principal for those crimes for which he personally has a requisite mental state.
In the case of a first degree murder conviction, the requisite mental state is that the defendant had the specific intent to kill. It is not enough to find merely that his co-conspirator or accomplice had the necessary mental state since this intent cannot be inferred to the accused.
It is necessary as to the co-conspirator who did not pull the trigger that the circumstances indicated that he also actively desired the death of or great bodily harm to the victim.
Where specific intent is required, one co-conspirator does not necessarily act as the agent for the other, the State has as to the accused on trial the burden of proving his specific intent beyond a reasonable doubt.
Thus, we find that although the prosecutor misstated the law, such does not constitute reversible error where, as here, the trial court's instruction properly and adequately summarized the law. Holmes, 388 So.2d at 727; State v. Tolbert, 390 So.2d 510 (La. 1980). For these reasons, this assignment of error is without merit.
Assignment of Error No. 3
By this assignment, defendant asserts the trial judge erred in not dismissing the entire petit jury venire after hearing the allegedly inflammatory, and hence prejudicial, remarks of a potential juror who was subsequently excused for cause.
Immediately after his acceptance as a juror by the state, one Mr. Giglione voiced the following opinion:
It hasn't come up. In the event of a guilty verdict, I'm a staunch advocate of public floggings, executions, and the death penalty. If the man is found guilty, as far as I'm concerned, it should be a mandatory death sentence. I'm a strong advocate of euthanasia, so it ought to be known.
*1120 Defense counsel then asked that Mr. Giglione be dismissed for cause. The record reflects the trial judge complied with the request. Counsel for defendant then objected to the fact that the entire panel was exposed to the above comment. Following defendant's objection, the trial court instructed the jury to ignore the statement made by Mr. Giglione. The matter was then dropped by all parties and did not surface again until defendant's brief on appeal.
Because of Giglione's remark, defense counsel asserts that it was impossible for the defendant to receive a fair trial. However, other than objecting to the entire panel, the defendant did not request the judge to admonish the jury (La.C.Cr.P. art. 771), nor did he move for a mistrial (La.C. Cr.P. art. 775). Apparently, defense counsel simply wanted the entire jury excused for cause. It is well-settled that a defendant's failure to timely move for a mistrial or request an admonition is a waiver of any error he may have claimed pursuant to La. C.Cr.P. articles 771 and 775. State v. Bolton, 408 So.2d 250 (La.1981); State v. Jones, 381 So.2d 416 (La.1980). Thus, the only issue raised by this assignment which is properly before the court on appeal is whether the trial judge abused his discretion in not dismissing that portion of the prospective jurors who heard Giglione's statement.
As noted above, the trial court may excuse a juror for any reason when doubt exists as to the competency of the prospective juror to serve in the case. La.C.Cr.P. art. 787. Necessarily, the defendant wanted the judge to hold all of the prospective jurors incompetent because they overheard Giglione's remark. Yet, it is significant to note that Mr. Giglione's comment did not in any way evidence an unalterable mind-set with respect to Kohler's guilt or innocence. Indeed, Giglione stated, "If the man is found guilty...". Thus, one can see that Mr. Giglione was more interested in articulating his personal philosophy on the death penalty than in prejudging the defendant's involvement in the crime. We do not think this was prejudicial as we do not choose to automatically assume the other jurors could not be earnest in their tasks because of Giglione's remark. The record reflects that after the incident complained of, defendant had ample opportunity to show either prejudice as a result of Giglione's remark, or alternatively, to diffuse the situation with appropriate questioning. However, neither was ever attempted. The determination of unnecessary prejudice lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. La.C.Cr.P. art. 787; State v. Jones, 315 So.2d 650 (La.1975). Because we do not believe that the trial judge's refusal to dismiss the entire panel for cause was an abuse of discretion, we hereby reject this assignment of error.
Assignment of Error No. 4
By this assignment, the defendant argues the trial court erred in excusing prospective jurors for cause who did not believe in the death penalty. Defendant asserts these veniremen were not fully questioned on their beliefs. Defendant argues this effectively resulted in allowing the state more peremptory challenges than it was entitled to by law. La.C.Cr.P. art. 799.
Louisiana Code of Criminal Procedure article 798 provides in pertinent part:
It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
. . . .
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt....
This article was amended to conform with the decision in Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and the same argument defendant *1121 posits in this assignment was recently rejected in State v. Whitt, 404 So.2d 254 (La. 1981) and State v. George, 371 So.2d 762 (La.1979), cert. denied, 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325 (1979). After carefully scrutinizing the record on voir dire examination, we are satisfied that each of the jurors were properly excused in strict compliance with the standards enunciated in Witherspoon and La.C.Cr.P. art. 798(2). After extensive and sensitive questioning by the trial judge, (the opportunity to question also extended to the state and the defendant) each juror excused, consistently and without equivocation, voiced unalterable opposition to the death penalty. The responses made by the prospective jurors clearly demonstrated that the jurors' deeply held beliefs would automatically compel them to vote against the imposition of capital punishment, without regard to any evidence which might have been developed in the trial of the case before them, or at the sentencing hearing in the event of conviction. Moreover, since the jury did not recommend and the trial court did not impose the death penalty, the defendant does not have a valid complaint of a Witherspoon violation. It has been expressly held that a defendant insulated from the death penalty does not have a valid Witherspoon complaint. George, 371 So.2d at 765; State v. Drew, 360 So.2d 500 (La.1978). Thus, this assignment of error is without merit.
Assignment of Error No. 5
By this assignment, defendant claims the trial court erred in not excusing for cause a venireman who would not accept the law of principals.
We have thoroughly perused that portion of the record relative to this assignment. The record reflects that after defense counsel requested the subject juror be excused for cause, the court denied counsel's request. Thereafter, defense counsel did not voice any objection to the ruling. Rather, counsel simply continued his voir dire examination. It is well-settled law in this state that pursuant to La.C.Cr.P. art. 841 a contemporaneous objection is required to preserve an error for appellate review. State v. Ratcliff, 416 So.2d 528 (La.1982). The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. State v. Herrod, 412 So.2d 564 (La.1982). The record indicates defense counsel made numerous objections to various rulings during voir dire examination. That counsel neglected to make a similar objection to the court's determination in the present matter inevitably leads to the conclusion that defense counsel was satisfied with the court's ruling. Thus, this assignment of error lacks merit.
Assignments of Error Nos. 16, 17 and 18
The above three assignments of error are similar to the assignments the court has previously dealt with in that they relate to the legitimacy of the jury chosen in this case.
By these assignments, the defendant argues the trial court erred in not granting a new trial on the grounds that: (1) both this defendant and another defendant (involved in the same crime) were being tried on the same day in different sections of the court, thereby prejudicing the entire venire; (2) many of the jurors empanelled were "tainted" because they had been questioned about the same murder in a different section of the court on the previous day; (3) defendant further contends that the trial court erred in not granting a new trial due to the prejudicial effect of wide-spread publicity surrounding the simultaneous trials of the two defendants.
In defendant's brief, he cites the court to numerous pages in the record allegedly forming the basis of these assignments. We will consider these incidents separately in order to determine if the defendant was prejudiced in any way. First, defendant refers the court to the case of a juror by the name of Ms. Ogle. Because Ms. Ogle stated she did not think she could remain free from prejudice given the fact her husband was a policeman, the court excused her for cause. Defense counsel made no objection and we certainly do not see any grounds for complaint on appeal.
*1122 The next three incidents related by the defendant involve veniremen McKnight, Luck and Dunshee. In response to questioning by the trial judge, these prospective jurors admitted they had read or heard about the case in the media. Upon close questioning by the judge, the former two jurors stated they could put whatever they were exposed to out of their minds; the latter venireman (Dunshee) said he could not divorce his opinion from what he had been exposed to. He was then excused for cause.
The next allegedly prejudicial situation arose during defense counsel's examination of various jurors. Counsel inquired whether anyone had been questioned as a potential juror in the case of the other defendant. Although the record does not reflect any answer to this question, apparently there were some veniremen nodding their heads "yes" because counsel's next question asks whether this would affect their decision in the present case. Once again the record does not contain an answer to this query. However, the next phrase in the transcript is a "thank you" from defense counsel. This response was not followed by any objection on the part of defense counsel. Clearly, the unreported responses of the veniremen to counsel's second question satisfied the defendant as to the jurors' impartiality and, therefore, defense counsel calculated that no objection or challenge was necessary.
The next incident cited by defendant involves four potential jurors who admitted to reading newspaper accounts of the crime, or stories on the upcoming trial. In response to the judge's question relative to whether the veniremen could disregard what they saw and render a verdict based solely upon what was presented in the courtroom, three jurors replied "yes", and one replied "no". The one who replied "no" was excused for cause.
Another allegedly prejudicial situation arose when a juror disclosed a close friendship with a potential witness. When asked by the trial judge if he could put this fact aside and judge the credibility of the witness as he would judge any other witness, the juror replied in the affirmative. In any case, the record reflects the venireman's friend was never called as a witness.
The final two incidents which are alleged as a basis for these assignments involve several veniremen who had been exposed to media accounts of the upcoming trial and one prospective juror who had been questioned, and apparently excused, as a juror in the trial of the other defendant involved in this crime. With respect to those veniremen exposed to media accounts of the trial, all jurors either emphatically stated they would not be influenced by what they saw or heard and could thus render a fair verdict or they were excused for cause.
Finally, in response to a question by defense counsel, the venireman called as a prospective juror in the other case stated this fact would not affect his ability to render a fair verdict in Kohler's trial. Indeed, he stated that he was unaware the cases were even related. In any case, the record reflects the juror was later excused for cause on unrelated grounds.
With respect to these assignments, defendant's brief refers the court to two cases he feels support his position. After closely reviewing both cases, we find them inapposite on the facts and are thus not dispositive of the outcome in this case. Indeed, in Leonard v. United States, 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964), the petitioner was convicted in separate trials and by different juries of two separate but related crimes involving similar facts. The jury in the case tried first announced its guilty verdict in open court in the presence of the jury panel from which the jurors who were to try the second case were selected. Petitioner objected to selecting a jury for the second case from among members of the panel who had heard the guilty verdict in the first case. The objection was overruled and the jury which found petitioner guilty in the second case contained five jurors who had heard the verdict in the first case. Obviously, the Supreme Court found this highly irregular and reversed the second conviction. Clearly this is the correct result; however, it has nothing in common with the present set of facts and is *1123 thus not determinative of the outcome in this case.
In the final analysis, the premise underlying all of these assignments of error is the alleged existence of prejudice on the part of the venire for essentially two reasons: (1) some prospective jurors had seen or heard media reports of the crime or the trial; (2) other veniremen had been questioned as potential jurors in the case of the other defendant on trial for the same crime. Perhaps the seminal case on the subject in Louisiana is the State v. Goodson, 412 So.2d 1077 (La.1982), decision involving the so-called "Highland Rapist" in the Shreveport-Bossier City area. In that case, defendant was involved in a sensational series of crimes resulting in wide-spread publicity. After his arrest and indictment, defendant filed a motion for a change of venue. This motion was denied after a hearing. The trial judge held that although the media publicity had been extensive, the defendant had not shown that the reports were inflammatory or that prejudice existed against him. The Supreme Court agreed with this determination. Nevertheless, because serious questions of possible prejudice were raised, the trial judge's order refusing to change the venue was vacated and the lower court was instructed to defer a ruling thereon until completion of voir dire examination.
Of course, constitutional standards of fairness require that a defendant have a panel of impartial jurors. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Qualified jurors need not, however, be completely ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). As stated in Goodson, 412 So.2d at 1080:
Under Murphy, extensive knowledge in the community of either the crimes or the putative criminal ... is not in itself sufficient to render a trial constitutionally unfair.
In the present case, defendant has failed to present us with any evidence that he could or did not empanel an impartial jury because of bias resulting from either media publicity or the fact that some veniremen were questioned in the other criminal trial. As one can see from this court's analysis of the incidents alleged by defendant to be indicative of the "taint" surrounding this venire, the trial judge was diligent in ferretting out the biased jurors and we do not believe any prejudice resulted to Mr. Kohler. Thus, the court rejects these assignments of error.
Assignment of Error No. 6
By this assignment, the defendant alleges the court erred in allowing the state to make an insufficient opening statement. La.C.Cr.P. art. 766 provides:
The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.
In his brief, defendant concedes that the state sufficiently detailed the nature of the evidence by which it expected to prove the charge. However, defendant argues that the opening statement was inadequate because the nature of the charge was not explained. The primary function of the prosecutor's opening statement is to set forth in general terms the nature of the charge sufficiently to enable the jury to follow the proceedings, and to inform the accused of what acts on his part the state intends to prove. State v. Chapman, 410 So.2d 689 (La.1981); State v. Drew, 360 So.2d 500 (La.1978); State v. Sneed, 316 So.2d 372 (La.1975).
Our review of the record indicates that the district attorney's opening statement adequately presented the factual context of the charge. The statement made it clear the state intended to prove that Kohler was involved in the kidnapping and attempted murder of Owen Meilleur and the fatal shooting of Randy Sebble. When the statement is read in conjunction with the questioning of the prospective jurors on voir dire, the reading of the charge against defendant by the minute clerk and the various comments of the trial judge, it is indisputable that the defendant was adequately informed of the nature of the charge.
*1124 It is settled law in Louisiana that the trial judge has wide discretion in controlling the scope and extent of the opening statement. State v. Brown, 428 So.2d 438 (La.1983); State v. Nettleton, 367 So.2d 755 (La.1979). Our review of the prosecutor's opening statement convinces us there was satisfactory compliance with La.C.Cr.P. art. 766, and as such, the trial judge did not abuse the discretion afforded him. Therefore, we reject this assignment of error.
Assignment of Error No. 7
By this assignment, defendant asserts the state committed error because it failed to notify counsel of its intent to use an inculpatory statement and because it referred to an inculpatory statement in its opening statement. However, we note that this assignment of error was not briefed or assigned for oral argument, and is thus considered abandoned. State v. Narcisse, 426 So.2d 118 (La.1983); State v. Lindsey, 404 So.2d 466 (La.1981).
Assignment of Error No. 8
By this assignment, defendant argues the trial court erred in not requiring the state to amend an insufficient indictment.
The pertinent part of the indictment in this case reads as follows:
That one ... Kim Kohler ... [u]nlawfully violated R.S. 14:30, by committing first degree murder of Randy Sebble.
Essentially, it is the contention of the defendant that this indictment is insufficient because it does not set forth the particular section of La.R.S. 14:30 pursuant to which defendant was indicted. Defense counsel did not file a motion to quash the indictment (La.C.Cr.P. art. 531), rather counsel simply objected to the indictment at a stage in the proceeding after the prosecutor had already made his opening statement. Nor did defense counsel ever request a bill of particulars which would have provided him with more information. La.C.Cr.P. art. 484. Instead, defendant simply argues that the use of a short form indictment was unconstitutional in this case.
Our constitution provides that an accused shall be informed of the "nature and cause" of the accusation against him. La. Const. of 1974, art. I, § 13. This constitutional provision is given force and effect by La.C.Cr.P. art. 464 which provides in part:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.
La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. The constitutionality of this short form scheme has been consistently upheld and will not be questioned here. State v. Baylis, 388 So.2d 713 (La.1980); State v. Liner, 373 So.2d 121 (La.1979). As stated in the comments to article 465 of the Code of Criminal Procedure:
The basic function of the specific indictment forms is to inform the accused of the crime charged, reserving a recital of the details of the offense for the bill of particulars, which is not subject to the same rules of strict construction as the indictment. This precludes use of the indictment as a vehicle for a battle of wits between the draftsman and a defense counsel who seeks to checkmate the state by reason of some inadvertent and often highly technical omission.
Defendant had adequate protection through the use of a bill of particulars. Yet, he chose not to pursue this avenue of relief. We think defendant was adequately informed of the nature of the charge against him and we therefore reject this assignment of error.
Assignment of Error No. 9
By this assignment, the defendant urges the state erred in not informing the defendant of the aggravating circumstances the state would rely upon in seeking the death penalty.
At the outset, the court notes several irregularities with this assignment. First, the defendant alleges the state rather than the court erred. Indeed, a perusal of the record will indicate that this alleged error was never clearly presented to the *1125 trial court. As such, it was never properly ruled on by the court and objected to by the defendant. Rather, it appears from the transcript that at the point in time when the error allegedly occurred, defendant was still objecting to the sufficiency of the indictment. Thus, we feel the trial judge was never adequately apprised of this issue by the defendant, and as such, it is not correctly before us for review. La.C.Cr.P. art. 841.
Secondly, although it is true that a defendant is entitled to pretrial notice of every aggravating circumstance relied upon by the state in seeking the death penalty, nevertheless, it is also true that the defendant must show he made an attempt to obtain this information. State v. Sonnier, 379 So.2d 1336 (La.1979); State v. Perkins, 375 So.2d 1179 (La.1979). Defendant has failed to make any such showing. Finally, it should be remembered that Kohler was not sentenced to death in this case. Given this fact, together with the knowledge that defendant did not seek the information prior to trial, we think the defendant has failed to show any violation of his substantial rights. La.C.Cr.P. art. 921. Accordingly, we reject this assignment of error.
Assignment of Error No. 10
By this assignment, the defendant asserts the trial judge erred when he allowed the state to introduce into evidence photographs which were allegedly prejudicial and unnecessary.
The record reflects defense counsel objected to the introduction of the exhibits numbered five through ten. Following a discussion between the district attorney, the defense counsel and the trial judge, the court held that several of the photographs of Randy Sebble were repetitious. As such, the state was ordered to select twoone of the body for identification purposes and another of the body in relationship to the entire crime sceneintroduce only these and exclude the remainder. The state complied with the court's order. Defendant thereafter lodged his objection.
It is well established that the test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury. Photographs of the body of a deceased victim have generally been held relevant to prove the corpus delicti, and to establish the identity of the victim. State v. Perry, 420 So.2d 139 (La.1982). A trial court's ruling with respect to the admissibility of such photographs will only be disturbed if the prejudicial effect of the photographs clearly outweighs their probative value. State v. Tonubbee, 420 So.2d 126 (La.1982). After examining the photographs in question, we do not consider them to be gruesome. Moreover, they were relevant to prove the identity of the murder victim and to corroborate the testimony of Owen Meilleur. We believe the probative value of the photographs outweighed any possible prejudicial effect, and as such, the trial judge did not abuse his discretion in allowing the introduction of the pictures. This assignment of error lacks merit.
Assignment of Error No. 11
By this assignment, defendant asserts the court erred by admitting into evidence testimony relative to an allegedly inculpatory statement made by Kohler. This statement was supposedly taken irrespective of the fact that defendant had previously expressed an interest in speaking to an attorney.[1] The testimony in question relates to declarations made by Kohler to St. Tammany *1126 Parish Sheriff's Clark Thomas and Guy LeBlanc.
On August 2, 1980, when defendant was initially taken into custody by St. Tammany Parish authorities, he was given his Miranda warnings. After defendant was transported to Slidell from New Orleans (where he was in custody), he was given his rights a second time prior to being "booked". The record reflects defendant did not waive any of his rights and, therefore, was not questioned in any respect.
Later, on August 4, 1980,[2] Detectives LeBlanc and Passaro met with defendant in an effort to further the investigation. Before any questions were asked, defendant was again advised of his Miranda rights. On his own volition, and without promises or threats from the officers, defendant voluntarily admitted his involvement in the crime. Defendant then proceeded to name the others at the scene but insisted that he did not do the shooting. When Detectives LeBlanc and Passaro began preparing for an extended interview, Kohler then said he did not want to say anything further without his attorney. The officers honored defendant's request and terminated the interview.
When confronted with the issue of whether the police can resume the questioning of an accused following his invocation of the right to counsel, our Supreme Court seems to have adopted the "scrupulously honor" test. State v. Thucos, 390 So.2d 1281 (La.1980); State v. Manning, 380 So.2d 46 (La.1980). In State v. Shea, 421 So.2d 200, 209 (La.1982), the Louisiana Supreme Court opined as follows:
Whether an accused's rights are "scrupulously honored" should depend on the particular facts of each case. Stated another way, it depends on the totality of the circumstances. The fact that the officer initiates further questioning after the accused has invoked his right to counsel should be only one of the factors considered in determining whether his right to counsel has been "scrupulously honored." Other factors, such as the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right to counsel and the subsequent interrogation, should be considered in making this determination.
Applying the factors in Shea to the present situation, we think it is clear that the rights of the accused were indeed "scrupulously honored." Testimony disclosed that Kohler had been given his Miranda rights no fewer than three times; the last time immediately before Kohler voluntarily admitted his involvement. No pressure whatsoever was put on the accused. Indeed, defendant seems to have simply volunteered his statement without any questions from the officers. Moreover, when it became evident defendant did not want to say anything further without speaking to an attorney, the detectives immediately concluded the interview.
Additionally, in light of defense counsel's apparent trial strategyadmitting defendant's presence at the scene but stressing the fact defendant was not the "trigger-man" we feel that the testimony relative to Kohler's statement was more innocuous than harmful. Indeed, Kohler's statement that he was involved but did not do the shooting seems to further the defense's strategy.
Suffice it to say, the conclusion of the trial court relative to the admissibility of statements such as those we have in this case should not be overturned unless it appears that the conclusion is wholly unsupported by the evidence. State v. Dison, 396 So.2d 1254 (La.1981); State v. Jackson, 381 So.2d 485 (La.1980). Our review of the record demonstrates that the evidence preponderates in favor of the trial judge's determination. State v. Brogdon, 426 So.2d *1127 158 (La.1983). Thus, this assignment of error lacks merit.
Assignments of Error Nos. 12 and 15
By these assignments, the defendant argues the trial court erred in failing to grant a directed verdict or a motion for a new trial on the ground that the verdict was contrary to the weight of the evidence. In particular, defendant avers the state failed to prove beyond a reasonable doubt Kohler possessed the specific intent to kill Randy Sebble.
In State v. Hoffer, 420 So.2d 1090, 1092 (La.1982), our Supreme Court enunciated the standard of review employed in this type of situation:
Our standard of review in cases where a conviction is challenged based on insufficiency of the evidence is mandated by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). There the United States Supreme Court determined that, to properly balance the roles of the trier of fact and the reviewing court, the relevant question is "... whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt...." 443 U.S. at 319, 99 S.Ct. at 2789. (emphasis in original) (Footnote omitted)
The scope of our appellate review function is not to determine whether this court agrees with the verdict. Rather, our review is limited to a determination of whether there is sufficient evidence to support the verdict.[3]State v. Washington, 421 So.2d 887 (La.1982).
The crime of first degree murder is defined in La.R.S. 14:30, in part, as follows:
First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery....
. . . .
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
The elements of the offense as charged in this case are: (1) the offender had the specific intent to kill or to inflict great bodily harm; and (2) was engaged in the perpetration of aggravated kidnapping; and/or (3) the offender had the specific intent to kill or to inflict great bodily harm upon more than one person. Specific intent is a state of mind in which "the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Furthermore, La. R.S. 15:445 provides as follows:
In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction.
An analysis into whether the jury in this case could have properly determined the prosecution proved every element of the offense requires that we view all the events of July 31, 1980, as a whole. Clearly, the evidence in the record most advantageous to the state is the testimony of Owen Meilleur. Owen's testimony detailing the events of July 31, 1980, was persuasive and went unrefuted by the defense.
Although we have previously described the facts, nevertheless, certain points should be reemphasized and expanded upon. It is important to remember that Vincent Allnet first suspected only Randy of stealing the jewelry. To that end he and Owen drove around in the car looking for Sebble. When Sebble later came over to Vincent's house, Allnet immediately attempted to beat the truth out of Randy. So from the outset of this sordid affair, Randy was considered an *1128 alleged participant in the case of the missing jewelry. It was only after Owen tried to stop Vincent from beating Randy that Owen was implicated in the theft.
Although Vincent was unsuccessful in beating the whereabouts of the jewelry out of Randy and Owen, nevertheless, he later joined forces with Richard Allnet, Floyd Webb and Kim Kohler in order to mount a second effort to recover the supposedly stolen jewelry. We do not think there exists any doubt that these individuals acted in concert to locate the items. Indeed, the jury would have been reasonable in basing their conclusion of Kohler's participation on any of several grounds. During direct examination, Owen testified as follows about the events that took place in the car after he was kidnapped at the Showboat Lounge:
Q Then what happened after you were in the automobile? Did they say why they wantedthey forced you into the automobile?
A They was hollering they were going to get their jewelry or satisfaction.
Q Go ahead. What happened then?
A They drove off, and I was getting beat and everything as they was driving.
Q Who was beating you as best you remember?
A I remember all of them hitting on me except Vincent because he was driving. All except Vincent.
Q Specifically, during the drive, did Kim Kohler ever beat on you?
A Yes, sir.
Later in his testimony, Owen describes what happened when Vincent stopped the car at the Seven-Eleven store for some beer:
Q Did you get out of the car?
A No, sir.
Q Did you try to get out of the car?
A Yes, sir. As we pulled in, there was a police car there. And as I was in thereFloyd Webb got out, and Richard and Kim were forcing my face in the seat so I couldn't make any motions to get out.
Q Did you try to get out of the car?
A I tried, yes, sir. I wanted to.
Q Why didn't you get out?
A Because I was held down.
Q Did Kim Kohler hold you down?
A Yes.
Q Did he say anything to you during that period of time?
A He was just telling me to shut up and hold still.
Q As of that point, had your life been threatened?
A Yes.
Q Did Kim Kohler threaten your life?
A I can't remember his exact words, but he was saying things about it.
Additionally, Owen's testimony about the events which took place in the car on the way to the crime scene certainly indicates the extent to which the effort to retrieve the jewelry was a group undertaking:
Q And before they stopped there, before they stopped there, did anybody say why they were stopping there?
A They was saying it was the last chance. They want me to talk, tell them where their jewelry was if I had it or that was it.
At the scene of the shootings, while Floyd Webb and Richard Allnet were forcing Owen out of the vehicle, Meilleur describes what Kohler was doing:
Q Do you recall what Kim Kohler was doing there at the time?
A I believe it was him and Vincent Allnet was watching Randy Sebble.
Q What do you mean, watching him?
A Making sure he wouldn't run off or anything.
Q What happened then? Just go ahead and explain after
A After they got me out of the car, they pushed me in front of the car. They started beating Randy and I both a little more. Then Floyd Webb shot bullets at the ground at our feet to make us jump up and down, dance.
Q You and Randy?
A Yes.

*1129 Q Did you all dance?
A Yes, to keep the bullets from hitting us.
Q And were they saying things to you at the time?
A They was ridiculing, cursing a lot.
After being beaten and shot Owen described what happened next:
Q Okay. Go ahead. Proceed. What now? You were laying down?
A Right.
Q Do you recall, were you on your stomach, on your side? How were you laying?
A I believe I went onto my stomach. And when I was laying there, I seen Randy Sebble holler at Vincent, "You done it. You really done it, Vincent." And Randy was coming toward the car, and Floyd Webb took a pistol and said, "I ain't taking no witnesses." And he shot him.
Q You saw Floyd Webb shoot Randy?
A Yes, sir.
Q Did you hear Randy say anything?
A No. He fell.
Q Did he ever say anything after that?
A No.
Q What happened after Randy was shot?
A They went to the car. They pulled off and they went the opposite way than what what they came.
Leaving Randy and Owen to die, the rest of the group fled the scene. They returned, however, and Meilleur testified as to what ensued:
Q And what happened?
A Well, I got there andI was halfway there at the timeexcuse meand Vincent and them come back.
Q How do you know it was Vincent and them?
A Because I heard his voice.
Q What happened when they came back?
A Vincent hollered, "See if they're dead."
Q How do you know it was Vincent that hollered that?
A I know his voice.
Q What were you doing at the time?
A When they pulled back up, I was you know, I was really scared, so I put my face down. I thought I was putting it in the mud. I didn't want them to see I was alive. And when I did, I put it into an ant pile.
Q Did you move while they were there?
A No, I didn't. I just laid still.
Q Explain to the jury what happened while they were back there.
A Kim Kohler got out the car. He come and kicked Randy and hollered, "The nigger's dead." And then he kicked me, and I just let it roll so he would think I was dead. And he said, "He's dead."
Q Kohler got back in the car?
A Right.
Q You said you didn't move your face, Owen?
A No, I didn't.
Q Why do you say that Kim Kohler is the one that did that?
A Because he was the only one that had these thongs on, flip-flops.
Q Flip-flops, I see. Had you known Kim Kohler?
A I knew him before this happened.
Q Did you know his voice when you heard it?
A Yeah.
Q Are you certain that it was Kim Kohler?
A Yes.
Finally, Owen concludes his testimony with a comment on Kohler's involvement:
Q How many people were involved and what happened to you?
A Counting Randy Sebble and myself, there were six of us.
Q Did Kim Kohler do anything to help either you or Randy during this period of time?
A No, sir, he didn't.

*1130 Q Did he do anything to help Floyd Webb, Vincent Allnet and Richard Allnet?
A Yes.
Q What did he do to help them?
A He was in the car with them. He helped hold me down at one point. He was there to make sure nobody tried to run away, so he was helping them.
We believe the jury calculated that the Allnets, Webb and Kohler intentionally enlisted the help of each other to recover the allegedly stolen jewelry. The lengthy trip to the deserted side road, the presence of the shotguns hidden in the truck, the existence of another handgun passed among the participants in the automobile tend to suggest a preconceived plan to extort the jewelry out of Randy and Owen. These factors, together with the testimony of Owen cited above, and the acknowledgment of his involvement to the detectives certainly could support the determination that Kohler had the specific intent to kill or inflict great bodily harm on Randy. We think that when the evidence is viewed in a light most favorable to the state, then it is certainly reasonable that a rational trier of fact could have concluded Kohler was guilty of the first degree murder of Sebble. The events of July 30, 1980, when viewed as a whole, clearly demonstrate that Kohler voluntarily participated in each and every step calculated to recover the jewelry. Inevitably, but not surprisingly, when the allegedly stolen goods were not handed over, Randy and Owen were shot. We agree with the jury's determination of guilt, and as such, we reject these assignments of error.
Assignment of Error No. 13
By this assignment, defendant alleges that the responsive verdicts to the crime of first degree murder are unconstitutional because of the omission of aggravated battery.
The provision of the Code of Criminal Procedure dealing with responsive verdicts (article 814) has long been held constitutional and will not be questioned here. State v. Simpson, 216 La. 212, 43 So.2d 585 (1949). In State v. Marse, 365 So.2d 1319, 1322 (La.1978), the Supreme Court wrote:
The wisdom of the Louisiana responsive verdict systemboth as to those verdicts included and those excludedhas been questioned ... However, this Court has repeatedly upheld Article 814 against constitutional attacks. See, State v. Qualls, 353 So.2d 978 (La.1977); State v. Cook, 345 So.2d 29 (La.1977); State v. Palmer, 344 So.2d 964 (La.1977).
Moreover, since the elements of the crime of aggravated battery are not the same as those for first degree murder, the former verdict would be unresponsive to the latter verdict. Thus, we reject this assignment of error.
Assignment of Error No. 14
By this assignment, the defendant alleges the trial judge erred when he denied the defendant's request for special instructions and when he denied the defendant's oral request for an instruction on adverse presumption for failure to produce a witness. The second of these points was not argued or briefed and is thus considered abandoned. Narcisse, 426 So.2d at 131.
With respect to the first point raised, the record reflects that the defense counsel requested the jury be instructed as follows:
No crime can exist without a combination of criminal act and criminal intent. Intent cannot be transferred. Where there is no criminal intent, there can be no guilt, regardless of the law of "principal."
Louisiana Code of Criminal Procedure article 807 provides in part:
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
See also State v. Smith, 414 So.2d 1237 (La.1982). Our review of the record convinces us that the trial court's general jury charge was an accurate and complete statement *1131 of the applicable law. The points raised by the defendant and requested in his special charge were wholly contained in the court's general charge. Thus, the trial court did not err in refusing to give this charge to the jury, and as such, this assignment of error lacks merit. State v. Donahue, 408 So.2d 1262 (La.1982).
For the reasons assigned, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In assignment number seven, defendant asserted error was committed because the district attorney failed to notify defense counsel of his intent to use an inculpatory statement. Since this assignment was not argued or briefed, we considered it abandoned. Nevertheless, our close review of the record makes it abundantly clear that defense counsel was indeed provided with the notice required in La.C.Cr.P. art. 768.

Of course, the present assignment raises a different issue. Defendant now argues that regardless of whether the prosecution supplied him with proper notice, the inculpatory statement should not have been admitted on other grounds.
[2] The statement of the defendant was given prior to the effective date of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). State v. McCarty, 421 So.2d 213 (La. 1982).
[3] Indeed, for an interesting analysis of the scope of this court's appellate review in criminal cases, see the specially concurring opinion in State v. Ruple, 426 So.2d 249, 253 (La.App. 1st Cir.1983).