610 So.2d 991 (1992)
STATE of Louisiana,
v.
Jerry "Bo" WILLIAMS.
No. 91 KA 0716.
Court of Appeal of Louisiana, First Circuit.
November 23, 1992.
*994 Public Defender, Amite, for defendant-appellant.
Charles Genco, Asst. Dist. Atty., Amite, for plaintiff-appellee.
Before WATKINS, CRAIN and GONZALES, JJ.
WATKINS, Judge.
Jerry "Bo" Williams was indicted with second degree murder and armed robbery charges, violations of LSA-R.S. 14:30.1 and LSA-R.S. 14:64, respectively. He pled not guilty, and after trial by jury, he was convicted as charged. On the second degree murder count, the court sentenced defendant to serve a term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. On the armed robbery count, the court initially sentenced defendant to serve a term of ninety-nine years imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, consecutive to the life sentence. Subsequently, the state filed a bill of information charging defendant as a third felony offender. See LSA-R.S. 15:529.1. After a hearing, the trial court found defendant to be a third felony offender. The court vacated defendant's sentence on the armed robbery count and resentenced defendant to serve a term of one hundred twenty-five years imprisonment, without benefit of parole, probation, or suspension of sentence.[1] Defendant has appealed, urging thirteen[2] assignments of error[3] as follows:
1. Defendant was denied his right to effective assistance of counsel in the trial court.
A. Counsel failed to cross-examine a witness regarding her identification of defendant.

*995 B. Counsel failed to introduce evidence of post lineup testimony and to call witness to testify to this.
C. Counsel relied solely on a defense of alibi when the only witnesses available to establish this defense were relatives of defendant.
D. Counsel failed to object to judge's examination of a witness in the presence of the jury.
2. Defendant was denied his right to an impartial jury of his peers.
3. The trial court erred to the prejudice of defendant by failing to declare a mistrial or to grant a cautionary instruction when the assistant district attorney failed, in his opening statement to itemize the testimony and evidence, and to specify what the state intended to prove as necessary elements of the offenses charged.
4. The trial court erred in refusing to order the sequestration of a material witness of the state.
5. The trial court erred in examining a witness constituting a comment on the facts of the case.
6. The trial court erred by admitting gruesome pictures of the victim.
7. The trial court erred by admitting pictures of a material witness for the state showing her beaten by an individual other than defendant.
8. The trial court erred in overruling defendant's objection to the questioning of defendant concerning previous violent acts on the part of defendant.
9. The trial court erred in denying defendant's request to introduce the transcript of defendant's taped statement.
10. The trial court impermissibly shifted the burden of proof to the defendant by instructing the jury that defendant could be presumed to intend the natural and probable consequences of his acts.
11. The cumulative prejudicial impact of the numerous errors of the trial court denied defendant due process of law.
12. Defendant's second degree murder conviction must be reversed because there was no evidence from which a rational juror could have found, beyond a reasonable doubt, that the state had proved the existence of all elements of the offense.
13. Defendant requests a review of the record for errors patent on the face of the record.

FACTS
On the afternoon of January 12, 1988, John and Mary Albanese visited some friends, shopped for a few groceries, and returned to their home in Independence, Louisiana. When they reached the house, Mrs. Albanese got out of their car and approached their house to unlock the door. Mr. Albanese, who was eighty-one years old and walked with a cane, took longer to get out of the car. As Mrs. Albanese was unlocking the door, she heard a car drive up. She turned and saw the face of the black man[4] who was the driver. She was able to view only part of the vehicle because her husband's car partially blocked her view. She assumed the man in the car had come to talk to her husband about buying a boat. On the previous night, a black man had stopped by and expressed an interest in buying a boat that was located near the Albanese house. Mr. Albanese had told the man to come back later to give him a chance to talk to his son, who owned the boat.
Within minutes of entering her home Mrs. Albanese heard a "bang, a popping noise." She thought her husband had hit a clothesline prop. Before she had time to return to the entrance, she heard the sound of a car making a rapid get-away. Mrs. Albanese then saw her husband lying on the ground near their automobile, and she thought he had had a heart attack. She assumed that the person in the other car had left quickly to get help for her ill husband.
*996 Emergency personnel, both with an ambulance service and later at the hospital, treated Mr. Albanese for cardiac arrest; he was pronounced dead at the emergency room. After speaking with ambulance personnel, the coroner assumed the small puncture wound (with no bleeding) on Mr. Albanese's back was caused by vigorous CPR. No evidence of foul play was reported.
Later, Detective Chester Pritchett of the Tangipahoa Parish Sheriff's Office investigated the case because authorities noticed unusual circumstances relating to the victim's death: the wound on the victim's back, the popping sound heard by Mrs. Albanese, and the fact that Mr. Albanese's wallet was missing. Mrs. Albanese testified that her husband never left the house without his wallet; however, Mrs. Albanese, an ambulance worker, an emergency room nurse, and Chief Jesse Pigno of the Independence City Police Department testified that they were unable to locate the victim's wallet. Prompted by the investigation, the coroner performed an autopsy three days after the victim's death and concluded that the cause of death was a gunshot wound to the chest. The bullet entered the victim's body in the back and, traveling in a slightly upward manner, struck the victim's aorta artery, heart, and upper lung. The coroner removed a .22 caliber slug from the victim's body. When asked for information concerning the distance between the gun and the victim, the coroner testified that he was able to say only that "it had to be at a distance" and not close up. He also opined from the angle of the shot that the victim and the perpetrator were both standing up, or both kneeling, or both sitting.
Valerie Thompson, defendant's former girlfriend, testified as a witness for the state, admittedly in exchange for immunity from prosecution on any charges related to the shooting of Mr. Albanese. She testified that on the date of the offenses she saw defendant at a bar in Amite. At about 3:30 p.m., defendant and Ms. Thompson left the bar to take "Jewel" Robinson to his home in Independence. Instead, they stopped at a house. Although Ms. Thompson did not know who lived there, she had been to the same house a month or two earlier with defendant and another man when the two men were trying to sell something. Prior to trial, Ms. Thompson retraced the route with Det. Pritchett who identified the house as being the Albanese residence.
Ms. Thompson testified that when defendant stopped the car at the house, Mr. Robinson got out of the car and started walking down the street, presumably to go home. Defendant got out of the car and walked toward the house which she could not see because a bush blocked her view. Ms. Thompson did not see anybody else at the scene, and she did not see the victim. After defendant left the car, Ms. Thompson heard a gunshot from the direction of the house, and she "guess[ed]" defendant was at the house when she heard the shot. After the shot, defendant returned to the car and they left. Ms. Thompson did not discuss with defendant the shot or the purpose for the stop.[5] Defendant then took her home to Amite.
Ms. Thompson admitted that she did not go to the police when she heard about the victim's death, and that she previously had told Roy Bell, a former boyfriend, that she had not told the police the truth about the offenses.
Defendant testified in his own defense. He denied any participation in the offenses and claimed Ms. Thompson was lying. Defendant remembered the day the victim died. Through his own testimony, the testimony of his mother, sister, and grandmother, and the testimony of three friends (including "Jewel" Robinson), defendant presented an alibi that he was at home when the offenses occurred. Both he and Mr. Robinson denied being with Ms. Thompson that day.
*997 SUFFICIENCY OF THE EVIDENCE[6]
When a case involves circumstantial evidence,[7] as this one does, and the jury "reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." State v. Jacobs, 504 So.2d 817, 821 n. 6. (La.1987).
At trial defendant's major hypothesis of innocence was that he was somewhere else at the time of the crime. Defendant not only presented several alibi witnesses to support his contention that he was not at the scene, but he took the witness stand and denied being at the Albanese home at the time of the shooting. The jury's decision that defendant was guilty of the two charges shows that the jurors concluded that defendant's version of his whereabouts on the day of the shooting was a fabrication designed to deflect blame from him. Such a finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind...." See State v. Captville, 448 So.2d 676, 680 n. 4 (La.1984). "Lying" has been recognized as indicative of an awareness of wrongdoing. See State v. Rault, 445 So.2d 1203 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984). As this court stated in State v. Guirlando, 491 So.2d 38, 41 (La.App. 1st Cir.1986):
The jury viewed the defendant's appearance and demeanor when he testified. Their verdict indicates they found the defendant's testimony was not credible and, therefore, they gave it no weight and rejected it. This is a finding of fact over which this court has no jurisdiction. La. Const. of 1974, art. V, § 10(B); Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); State v. Trosclair, 443 So.2d 1098 (La.1983) [cert. dismissed, 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984)]; State v. Richardson, 425 So.2d 1228 (La.1983); State v. Marshall, 479 So.2d 598 (La.App. 1st Cir. 1985); State v. Jacobs, 435 So.2d 1014 (La.App. 1st Cir.1983). The jurors could have reasonably inferred that the failure of the defendant to tell the truth supported the inference that the truth was unfavorable to him and also showed an awareness of wrongdoing.
Because the guilty verdict indicates that the jury rejected the defendant's own testimony that he was not at the scene of the shooting, as well as the testimony of defendant's alibi witnesses, we must examine the record for another hypothesis that raises a reasonable doubt. See State v. Jacobs, supra. On appeal, defendant mainly argues that his identity was not proved beyond a reasonable doubt, and thus the jury was wrong in deciding that he was the perpetrator of the crimes of murder and armed robbery. The methodology required for our examination of the identification hypothesis to determine the existence vel non of a reasonable doubt is clear: we must evaluate the evidence in the light most favorable to the prosecution and determine whether his alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. See State v. Jacobs, supra. After reviewing the trial testimony, we find that the state adequately established defendant's presence at the scene.[8] Although Mrs. Albanese had difficulty during *998 the physical lineup in narrowing her selection between defendant and another man, she finally identified defendant at the lineup and also identified defendant in court. Valerie Thompson also identified defendant in court as being present at the scene. The jury was free to accept or reject, in whole or in part, the testimony of any witness, (see Richardson, 459 So.2d at 38), and we cannot say that the jury could not have found proof of defendant's identify beyond a reasonable doubt.
Having found sufficient evidence that defendant was correctly identified as the person present at the scene, we now review defendant's other hypothesis for reasonableness. Defendant suggests that someone else,[9] perhaps someone from the near-by housing project, did the shooting. There are two points of evidence that militate against that hypothesis: first, the split-second timing of the incident; second, defendant's flight.
Mrs. Albanese testified that the defendant's car drove up as she was entering her house. She had not had time to reach the kitchen of her home before she heard the "popping" sound, which later proved to be a gun shot. Valerie Thompson testified that she heard the sound after the defendant got out of his car, and that the defendant returned to the car immediately after the sound. She further testified that "Jewel" Robinson had started to walk home and that she did not see anyone else at the scene. It is not reasonable that between the time of the Albaneses' arrival at home and the time when Mrs. Albanese heard the gunshot, a gunman arrived at the Albanese home and shot Mr. Albanese, but remained undetected by Mrs. Albanese, the defendant, and Ms. Thompson.
The proof of defendant's flight was Mrs. Albanese's testimony that the car defendant had driven up and stopped near their car sped away after she discovered her husband lying on the ground. Although an individual's flight does not in and of itself indicate guilt, it can be considered as circumstantial evidence that the individual has committed a crime; flight shows consciousness of guilt. State v. Hosford, 572 So.2d 242 (La.App. 1st Cir. 1990), writ denied, 576 So.2d 27 (La.1991). Flight is one of the circumstances from which guilt may be inferred. State v. Brown, 504 So.2d 1055 (La.App. 1st Cir.), writ denied, 506 So.2d 1223 (La.1987).
Accordingly, after viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to allow a rational trier of fact to find that the essential elements of second degree murder were proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
Likewise, we find the defendant's conviction for armed robbery is supported by sufficient evidence. The testimony is clear that the victim always carried his wallet. He was taken immediately to the hospital after being shot outside his home. His wallet was never found. That strong circumstantial evidence permits an inference that the wallet was taken in connection with his shooting death.
Furthermore, with the evidence being sufficient to convict defendant of shooting the victim to death, the circumstantial evidence becomes even stronger that the wallet was taken in connection with the shooting. There was no relationship between defendant and the victim. There is nothing in the record to indicate why defendant would pull into the driveway behind the victim, shoot him to death for no reason, and then leave. A juror considering the evidence most favorably to the state would not be unreasonable in finding that the shooting of the victim was in connection *999 with robbing him of his wallet and that the evidence precluded any other reasonable hypothesis of innocence.
INEFFECTIVE ASSISTANCE OF COUNSEL
In the first assignment of error, defendant maintains his trial attorney was ineffective. Normally, a claim of ineffective counsel is raised more properly by an application for post-conviction relief in the district court where a full evidentiary hearing may be conducted. However, where the record discloses evidence needed to decide the issue of ineffective assistance of counsel and the issue is raised by assignment of error on appeal, the issue may be addressed in the interest of judicial economy. State v. Price, 498 So.2d 244, 248 (La.App. 1st Cir.1986), writ denied, 503 So.2d 474 (La.1987).
A convicted defendant who claims error because of his trial counsel's ineffectiveness must establish two separate elements in order to succeed:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, reh'g denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). Only if the defendant shows both error and prejudice will his conviction or sentence be found unreliable and set aside. Furthermore, it is unnecessary to address both issues of counsel's performance and of prejudice to the defendant if petitioner makes an inadequate showing on one component. State ex rel. Busby v. Butler, 538 So.2d 164, 168 (La.1988).
Defendant divides his complaints concerning his trial attorney's performance into four areas: (1) failure to cross-examine Mrs. Albanese concerning her identification of defendant; (2) failure to introduce evidence of Mrs. Albanese's uncertainty when she identified defendant at the physical lineup; (3) presentation of the alibi defense using relatives as witnesses; and (4) failure to object to the judge's examination of a witness. We will address each of these areas separately.
Cross-examination of victim's wife: Defendant first argues that his attorney was ineffective because he did not cross-examine the victim's wife. Defendant specifically asserts the attorney should have questioned Mrs. Albanese concerning her identification of defendant and her ability to observe the man she saw in the automobile. Defendant claims that Mrs. Albanese was distracted when she saw the man because she was unlocking the door and because a bush and her husband's car blocked her view. Defendant also complains that his trial attorney did not question Mrs. Albanese about her failing eyesight. Additionally, defendant asserts that the attorney should have impeached Mrs. Albanese with evidence of her bias as a result of her having been married to the victim. Defendant also complains that his attorney did not ask Mrs. Albanese to describe the efforts which were made to locate the victim's wallet.
For the reasons which follow, we find that defendant was not prejudiced by his attorney's failure to cross-examine Mrs. Albanese. Several of the facts defendant claims his trial attorney should have established on cross-examination already had been established. On direct examination, Mrs. Albanese explained that she was unlocking the door to her house when she heard the car drive up. She indicated she was not able to see the entire car because the car defendant was in was directly behind her own car. Although she did not say her view was obstructed by a bush, she said her husband parked the car by a big bush; other witnesses and photographs described the location of plants and trees on the property. According to Mrs. Albanese's testimony, she had been married for over fifty-seven years when her husband *1000 was murdered. The jury could weigh her testimony in light of the long relationship without questioning by the defense.
Defendant correctly notes that Mrs. Albanese was not asked about her eyesight or her efforts to locate the victim's wallet. We recognize that the answers to these questions do not otherwise appear in the trial record. However, questioning Mrs. Albanese about her eyesight possibly would have given her the opportunity to make the jury think her eyesight was better than they might already have assumed; she was eighty years old and apparently had been unable to telephone the authorities after finding her husband on the ground outside their home. Additionally, counsel's failure to question Mrs. Albanese about her efforts to locate her husband's wallet did not deprive defendant of a fair trial.
Although defense counsel did not examine Mrs. Albanese when she testified in the state's case-in-chief, counsel did examine her when the state called her as a rebuttal witness. At that time, defense counsel asked Mrs. Albanese several questions concerning her description of the man she saw in the vehicle, in particular her claim that the man had marks on his left cheek. Accordingly, defendant's ineffectiveness claim for failure to cross-examine Mrs. Albanese is without merit.
Identification of defendant at physical lineup: Defendant argues that counsel should have called Robert Troyer as a witness at the trial to rebut Mrs. Albanese's identification of defendant. Mr. Troyer is an attorney who handles cases for the public defender's office. He testified at the preliminary examination that he observed the physical lineup in this case at the request of the sheriff's office. He estimated that it took Mrs. Albanese about forty-five minutes to identify defendant and that she was indecisive and unable for a while to choose between defendant and another man standing in the lineup. She looked at each of the two men several times individually before finally saying, "I think it's him."
After reviewing the entirety of the trial testimony and exhibits, we conclude defendant's trial attorney was not derelict for not calling Mr. Troyer as a witness. Defense counsel instead introduced a videotape of the lineup, and the videotape was the best evidence of the lineup. The video tape contains the entire proceeding, from the positioning of the men who would stand in the lineup until after Mrs. Albanese's selection of defendant. The recording lasts only about twenty minutes, and it shows that Mrs. Albanese took about fifteen minutes to select defendant after viewing the first person in the lineup. Mrs. Albanese's confusion is obvious, but so is her cool head and determination to make a careful selection. From the videotape, it is obvious that Mrs. Albanese had difficulty narrowing her selection between defendant and another man. Thus, counsel cannot be faulted for failing to call Robert Troyer as a witness.
Presentation of alibi defense: Defendant argues that his trial attorney should not have pursued the alibi defense because only relatives were available to establish the alibi and because counsel had notice the state intended to rebut the alibi defense. However, the record indicates that in addition to calling defendant's mother, sister, and grandmother as alibi witnesses, counsel called three friends of defendant. Two of these friends especially remembered the day when the victim died and partially corroborated defendant's testimony about his activities at the time. Furthermore, none of the state's rebuttal witnesses specifically contested the alibi defense presented by defendant. The general manager of the local cable television company discredited defendant's mother's testimony that she had watched cable television for a portion of the day by testifying that his company's records did not show that the residence had cable. However, the manager was not present at defendant's residence on the date of the offense and was not asked about defendant's whereabouts. Thus, defendant's allegation that the state had specific witnesses to rebut his alibi witnesses is not supported by the record. We have examined the testimony of each of the alibi witnesses and find no *1001 deficiency in the attorney's decision to pursue the defense. The alibi witnesses appeared prepared for their testimony; other than defendant's elderly grandmother, each one was able to provide specific details about the day. Although the jury chose not to believe the alibi witnesses, we will not second guess the attorney's decision to pursue the alibi defense.
Failure to object to judge's questioning of a witness: Defendant argues that his attorney should have objected when the court questioned a witness and commented on the witness's testimony. In connection with this claim defendant refers to assignment of error number five. For the reasons expressed below in connection with assignment of error number five, we find that defendant was not prejudiced by his attorney's failure to object. The court's questioning resulted in the witness's answering the same question that defense counsel had asked. In essence, the court was overruling the state's objection to the defense line of questioning and allowing the questioning to proceed as defense counsel had wanted.
Defendant also cites a portion of defendant's testimony in which the court questioned defendant. On direct examination, defendant was explaining why he thought Valerie Thompson was lying. On the night before his arrest, he had a fight with Ms. Thompson and cut her. He also was aware that Ms. Thompson was wanted by the police for writing some worthless checks. When the state objected to the testimony, the court responded that defendant's testimony "sounds like rank hearsay." The court then questioned defendant about the source of the information and reminded defendant that he could not testify concerning something he was told. Further questioning by defense counsel confirmed that a portion of defendant's testimony was hearsay. Defendant claims his attorney should have objected to the court's questions and comments. However, the trial court's questions and comments merely were an attempt to clarify defendant's testimony to allow the court to rule on the state's objection. The court did not directly nor impliedly comment on the facts, and defendant was not prejudiced by the court's questions. See State v. Burrell, 561 So.2d 692, 702 (La.1990), cert. denied, ___ U.S. ___ 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Williams, 500 So.2d 811, 815 (La.App. 1st Cir.1986). Any objection defendant might have made to the court's statements would have been without merit. Thus, defendant was not prejudiced by his attorney's failure to object.
Accordingly, after reviewing each of the separate arguments advanced by defendant and after reviewing the conduct of his counsel throughout the trial, we find defendant received the effective assistance of counsel. The assignment of error is without merit.
DENIAL OF RIGHT TO CROSS-SECTION OF COMMUNITY IN JURY VENIRE; RACIAL DISCRIMINATION IN EXERCISE OF PEREMPTORY CHALLENGES
In assignment of error number two, defendant asserts he was denied the right to an impartial jury of his peers. He argues that, as the result of the absence of a sufficient number of black jurors in the available venire, he was deprived of the right to a cross-section of the community. He also contends that the prosecutor's exercise of peremptory challenges to exclude three blacks from the jury violated the guarantee of equal protection.
After the jury was selected and sworn, defendant objected to the venire and "move[d] to strike the whole venire." Counsel complained that only four blacks were available in the venire and that the state had challenged three of them. In response, the state provided its reasons for challenging the three black jurors and indicated that it had accepted two blacks for service on the jury. Defendant did not correct the state's figures; thus, it is apparent that five blacks were in the total venire.
Initially, we note that defendant did not preserve the complaints he raises in connection with this assignment of *1002 error. A motion to quash based on the ground the petit jury venire was unconstitutionally drawn should be filed in writing prior to the beginning of the jury selection. See LSA-C.Cr.P. arts. 521, 532(9) & 535(C). See also La.C.Cr.P. art. 535, comment (c)(3); State v. Crocker, 551 So.2d 707, 711 (La.App. 1st Cir.1989). Additionally, an objection to the prosecutor's use of peremptory challenges of members of a certain race must be made before the entire jury panel is sworn. State v. Jones, 596 So.2d 1360, 1368 (La.App. 1st Cir.), writ denied, 598 So.2d 373 (La.1992). Although defendant argued both of these concerns when he moved to strike the whole venire, the motion came after the jury was selected and sworn and, thus, was untimely.
Moreover, even if defendant were not procedurally barred from advancing this assignment of error, his claims would be without merit. A general jury venire "shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." LSA-C.Cr.P. art. 419. The defendant bears the burden of proving the grounds for setting aside the venire. That burden of proof requires that the defendant show more than the underrepresentation of blacks on the petit jury venire in order to prove a systematic exclusion of blacks. The law requires that there must not be a systematic exclusion of blacks in the source or sources from which jury venires are chosen. However, a defendant is not entitled to a petit jury which reflects the population of the community in every respect. State v. Lee, 559 So.2d 1310, 1313-14 (La. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991).
In the instant case, defendant failed to establish that blacks were systematically excluded from the petit jury venire. Other than arguing that only four blacks were in the venire from which defendant's jury was selected, defendant made no effort to establish the claim. He did not establish the racial composition of the parish; nor did he definitively establish the racial composition of the jury. See State v. Lowenfield, 495 So.2d 1245, 1254 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).
Defendant's claim that the prosecutor exercised peremptory challenges on the basis of race also is without merit. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that an equal protection violation occurs when the prosecutor, in the trial of a member of a cognizable racial group, exercises peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. In Batson, the Court also set standards for assessing a prima facie case of purposeful discrimination; it placed the burden on the prosecution, after such a prima facie showing, to come forth with a neutral explanation for challenging black jurors that related to the particular case. See State v. Collier, 553 So.2d 815, 817 (La.1989).
In evaluating whether or not an attorney's explanation for exercising peremptory challenges is race-neutral, a court must determine "whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." Hernandez v. New York, ___ U.S. ___, ___, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). The reasons offered to explain the exercise of the peremptory challenges should be deemed race-neutral unless a discriminatory intent is inherent in those reasons. Hernandez, ___ U.S. at ___, 111 S.Ct. at 1866.
In the instant case, although the trial court never ruled on whether the defendant had made a prima facie showing of intentional discrimination, the prosecutor offered explanations for peremptorily challenging three prospective black jurors.[10] *1003 The prosecutor explained that he challenged Beverly Berry because she left her previous job with a cafeteria after a disagreement. After leaving that job, she was unemployed for three years and received welfare. The prosecutor also indicated that he felt that Ms. Berry was "staring me down while I was trying to talk to her." As to Michael Martin, the prosecutor stated that he challenged Mr. Martin because Mr. Martin had an arrest record and was upset when his full name was read by the clerk. As to the other black prospective juror challenged peremptorily by the state, the prosecutor explained that Eloise Bezue had not been employed for eight years. The prosecutor indicated that he wanted "steady income makers" on the jury.
Defendant claims the reasons offered by the state, particularly the explanation that the state did not want unemployed persons on the jury, was an insufficient justification. When defendant objected before the trial court, defendant argued that some white people who were unemployed were not challenged by the state. However, we have reviewed the entire voir dire, and we have found that although some of the prospective jurors which were not challenged by the state were unemployed, these unemployed prospective jurors generally were either homemakers or retired persons. As to each prospective juror, the prosecutor asked for information concerning occupation and length and place of employment. We find the prosecutor's explanations were clearly race-neutral bases for excluding the three black prospective jurors. See United States v. Harrell, 847 F.2d 138 (4th Cir.) (per curiam) (court finds that government's explanation that it wanted educated and employed persons on the jury was a sufficient race-neutral reason), cert. denied, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988); State v. Thompson, 516 So.2d 349, 353-54 (La.1987) (court finds that state's explanation that it did not want persons who had arrest records was a sufficient race-neutral reason), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
The assignment of error is without merit.
FAILURE TO DECLARE MISTRIAL
In assignment of error number three, defendant argues the trial court erred when it failed to declare a mistrial or issue a cautionary instruction for the failure of the prosecutor in his opening statement to itemize the testimony and evidence. Defendant claims the state's opening statement merely appealed to prejudice and did not set forth the nature of the charge or the nature of the evidence.
LSA-C.Cr.P. art. 766 requires the state to "explain the nature of the charge, and set forth, in general terms, the nature of the evidence" in its opening statement. Article 769 further provides that "[e]vidence not fairly within the scope of the opening statement of the state shall not be admitted in evidence." However, it is not necessary that the state detail every shred of evidence in an opening statement. State v. Edwards, 406 So.2d 1331, 1350 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The primary function of the prosecutor's opening statement is to set forth in general terms the nature of the charge sufficiently to enable the jury to follow the proceedings and to inform the accused of what acts on his part the state intends to prove. State v. Kohler, 434 So.2d 1110, 1123 (La.App. 1st Cir.1983). As a result, the defendant has adequate time for preparation of the defense and is not surprised by the state's evidence. See State v. Parker, 436 So.2d 495, 499 (La. 1983).
In the instant case, the prosecutor's opening statement was brief, and its reference to the facts of the case was as follows:
On January 12th, 1988, John and Mary Albanese were husband and wife; they were that way, until approximately a quarter to four, or four P.M. that afternoon. After that, they were no longer *1004 husband and wife. That man, Jerry "Bo" Williams, terminated that relationship, because on that day when John and Mary Albanese returned to their home, after having visited friends and stopped to shop, that man, while armed with a dangerous weapon, shot John Albanese in the back, and took his life.
Now, you will hear this story; you will hear the witnesses from that witness chair, and at the conclusion of this trial, we're gonna ask you to render justice to everyone involved in this case. And I'm gonna suggest to you that your just verdict at the conclusion of this trial will be that on January 12th, 1988, while armed with a dangerous weapon, Jerry "Bo" Williams robbed John Albanese and on January 12th, 1988, Jerry "Bo" Williams extinguished the life of this elderly gentleman, by shooting him once in the back.
For the reasons which follow, we find no merit in defendant's assignment of error. At the trial, defendant did not object or move for a mistrial on this ground. Thus, he is barred procedurally from advancing this argument on appeal. See LSA-C.Cr.P. art. 841. Additionally, defendant does not establish that the prosecutor's failure to generally set forth the nature of the evidence in the opening statement prejudiced defendant in any manner during the trial. Furthermore, during voir dire the prosecutor repeatedly referred to the two charges and noted that the state had "very little physical evidence." See Kohler, 434 So.2d at 1123-24. Thus, any error which resulted from the deficiencies of the state's opening statement would be considered harmless. See LSA-C.Cr.P. art. 921.
DENIAL OF SEQUESTRATION REQUEST
In the fourth assignment of error, defendant maintains the trial court erred when it refused to order the sequestration of a state's witness, Detective Chester Pritchett. Defendant argues the court should have required Det. Pritchett to testify before the other witnesses if he was going to be allowed to remain in the courtroom.
At the time of the trial, article 764(A) of the Louisiana Code of Criminal Procedure required trial courts to order exclusion of witnesses from the courtroom if the state or the defendant requested sequestration.[11] The court was authorized to except from the sequestration order "one officer or employee of the state who [was] designated as its representative for the entire trial by the district attorney." LSA-C.Cr.P. art. 764(B) (prior to its amendment by 1988 La.Acts, No. 515, § 3).
The purpose of sequestration is to assure that a witness will testify as to his own knowledge of the events, to prevent the testimony of one from influencing the testimony of others, and to strengthen the role of cross-examination in developing facts. The resolution of sequestration problems is within the sound discretion of the trial court. On appeal, the reviewing court will look at the facts of each case to determine whether or not a sequestration violation resulted in prejudice to the accused. State v. Revere, 572 So.2d 117, 125 (La.App. 1st Cir.1990), writ denied, 581 So.2d 703 (La.1991).
In the instant case, when the state moved for sequestration of the witnesses, it designated Det. Pritchett as the state's officer and asked that he be excluded from the sequestration order under the provisions of LSA-C.Cr.P. art. 764(B). Defendant objected, arguing that article 764(B) would not apply if the detective was going to be a witness in the case.
On appeal, defendant relies on State v. Lopez, 562 So.2d 1064 (La.App. 1st Cir.1990). In Lopez, this Court found that the trial court erred in allowing a police officer who was a state's witness to remain in the courtroom during the trial without requiring him to testify as the first witness. (See LSA-C.Ev. art. 615, comment (d)). In reversing the conviction, we explained that the officer was a principal *1005 witness against the defendant in the case (which involved a narcotics violation) and the state's case depended almost completely on the credibility of the law enforcement representatives.
The instant case is distinguishable from Lopez. Although Det. Pritchett was the chief investigator for the homicide, he was not a principal witness in the state's case. He testified that he became involved in the case on January 14, 1988, two days after the murder occurred. He was present at the autopsy and observed the coroner remove a bullet from the victim's body. The testimony he provided concerning the autopsy was not contested and was corroborated by the coroner who testified after Det. Pritchett. Thus, although Chief Pigno testified similarly before Det. Pritchett concerning the autopsy, the testimony of Det. Pritchett concerning the autopsy was not influenced by Chief Pigno or the other witnesses. See Revere, 572 So.2d at 124-27.
Another area of the detective's testimony on direct examination involved his explanation of a trip he took with Valerie Thompson in which she retraced the route defendant took in driving to the victim's residence. Because Ms. Thompson did not know the victim or the address of the house, the apparent purpose of the testimony was to establish that the place Ms. Thompson described was the victim's residence. Although defendant argues that Det. Pritchett benefitted by hearing Ms. Thompson's testimony before he testified, defendant provides no explanation for this speculation, and the testimony does not indicate that defendant possibly could have been prejudiced. Detective Pritchett also identified photographs taken at the victim's residence. These photographs merely showed the location of the victim's residence and were not contested.
On cross-examination, Det. Pritchett testified that Ms. Thompson would be eligible to receive some of the reward money. Although Det. Pritchett's testimony was inconsistent with Ms. Thompson's testimony on this point, Det. Pritchett's testimony was of benefit to defendant. Defendant had unsuccessfully tried to impeach Ms. Thompson with evidence that she was motivated by the reward money, and she had denied she would receive any money. However, Det. Pritchett explained that Ms. Thompson was in line to receive some of the money. Thus, defendant was not prejudiced by the detective's presence during Ms. Thompson's testimony.
The assignment of error is meritless.
EXAMINATION OF WITNESSES BY COURT
In the fifth assignment of error, defendant argues the trial court's examination of Valerie Thompson was improper and amounted to a comment on the evidence.
Defendant cites article 614(D) of the Louisiana Code of Evidence in support of the assignment. This provision prohibits the trial court from questioning a witness during a jury trial unless the court first secures the consent of all parties outside the hearing of the jury. However, the Code of Evidence was not in effect on the date of the trial. See 1988 La.Acts., No. 515, § 12(3). Prior to adoption of the Code of Evidence, even in a jury trial, the trial court had discretion to examine a witness in order to bring out needed facts not elicited by the parties. Trial courts were admonished to be cautious in the questioning of a witness so as not to impliedly comment on the facts. See State v. Burrell, 561 So.2d 692, 702 (La.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). Additionally, article 772 of the Code of Criminal Procedure provides that, in the presence of the jury, the trial court should "not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted."
On appeal, defendant complains of the court's questioning of Valerie Thompson. During cross-examination, defense counsel questioned Ms. Thompson concerning her testimony that she heard a gunshot and her ability to distinguish between a gunshot and exhaust backfire. When counsel asked Ms. Thompson "[w]here" she previously *1006 had heard a gunshot, the prosecutor objected on the ground of relevancy. Although not specifically ruling on the objection, the court proceeded to question Ms. Thompson as follows:
BY THE COURT:
Q On what occasion did you hear another gunshot?
A I doneI done heard lots o' guns being shot.
Q Speak toward the jury; don't look at me, just answer the question. Okay, you say you heard lots of gunshots?
A Yes. In bars, and you know,
BY [DEFENSE COUNSEL]:
Q In where? I didn't catch that last answer.
THE COURT: She said in bars and what not.
BY THE COURT:
Q Is that what you said?
A On the street. Yeah.
Q Okay.
MR. DUKES [defense counsel]: May I pursue this line of questioning, Your Honor?
THE COURT: Not too far. It's one thingwell, go ahead; you know what my limitations are.
MR. DUKES: All right. Your Honor, I'm trying; I'm sure the Court will stop me if I get out of line.
THE COURT: You're right.
We find no merit in defendant's assignment. Defendant did not object to the court's actions, and thus he has waived the argument for appeal. See State v. Ellwest Stereo Theatres, Inc., 412 So.2d 594, 597 (La.1982). Additionally, even if defendant had preserved the issue for appeal, the court's actions in questioning Ms. Thompson and, at one point, in repeating her testimony would not be reversible error. The court's questions and statements gave no indication of the court's opinion as to the merits of the case or the defense presented and did not cast any doubt on defendant's attempt to discredit Ms. Thompson's ability to recognize the sound of a gunshot. See State v. Wagster, 361 So.2d 849, 855-56 (La.1978). Moreover, the result of the line of questioning by the court was to establish the answer to defendant's question. Thus, defendant suffered no prejudice.
The assignment is without merit.
ADMISSION OF AUTOPSY PHOTOGRAPH
In assignment of error number six, defendant argues the trial court erred when it overruled the defense objection to introduction of photographs taken of the victim during the autopsy. Defendant contends that because the death of the victim and the manner of death already had been proven by other evidence, the probative value of the pictures was minimal, while the prejudicial effect which occurred with their introduction was immeasurable.
A photograph which illustrates or sheds light upon any fact or issue in the case or is relevant to describe the person, place, or thing depicted generally is admissible. A postmortem photograph of a murder victim is admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death, and to provide positive identification of the victim. The admission of a gruesome photograph will not be overturned unless it is clear that the prejudicial effect of the photograph outweighs its probative value. State v. Jones, 593 So.2d 1301, 1308 (La.App. 1st Cir.1991). The photograph, of course, "must be relevant for some purpose and a balance must be struck between the probativity of the photograph and its tendency `to overwhelm reason and to associate the accused with the atrocity without sufficient evidence.'" State v. Lindsey, 404 So.2d 466, 475 (La. 1981) (quoting 4 Wigmore, Evidence § 1157 (Chadbourn rev. 1972)).
During the testimony of Chief Pigno, the state introduced a picture of the victim taken at the autopsy. The picture shows a frontal view of the upper portion of the victim's body. Defendant objected to introduction of the photograph, arguing it was irrelevant because the witness already had identified a picture of the victim taken while he was alive. The court overruled the objection. Later, during the testimony of Detective Pritchett, the state introduced *1007 another picture taken of the victim at the autopsy. This picture shows the bullet wound and a portion of the victim's back. Defendant did not object to introduction of this photograph.
Because defendant did not object to introduction of the picture of the victim's back, he has waived the right to appeal the alleged court error concerning State Exhibit 6. See LSA-C.Cr.P. art. 841; State v. Sosa, 328 So.2d 889, 892 (La.1976). Even if defendant had preserved the right to appeal the admission of Exhibit 6, we find that introduction of either picture was not error. Exhibit 4 identifies the victim and corroborates the fact of death. Exhibit 6 corroborates the testimony of the coroner concerning the small size of the bullet wound and helps to explain how easily the wound was overlooked by emergency personnel and the emergency room doctor. The photographs, while unpleasant, are not so gruesome that this court must find that they would "overwhelm reason." Neither photograph depicts any blood or gaping wounds. The pictures were taken in a "sterile" environment, detached from the immediacy of the scene where the fatal shot was inflicted. See Lindsey, 404 So.2d at 476. When we balance the probative value of the photographs for proving the identity of the victim and the cause of death with the remote likelihood that the jury was inflamed simply upon seeing these pictures, we find that the probative value of the photographs outweighs the possible inflammatory effect.
The assignment of error is without merit.
ADMISSION OF PICTURES OF STATE'S WITNESS
In the seventh assignment of error, defendant maintains the trial court erred when it overruled defendant's objection to the introduction of pictures taken of a state's witness, Valerie Thompson, which showed injuries she received during an altercation with Roy Bell. Defendant contends the pictures were prejudicial because they tended to make the jury sympathize with a witness who otherwise was unsympathetic and unbelievable. Defendant also asserts the photographs were irrelevant because the injuries were inflicted by Mr. Bell and not by defendant.
At the time of the trial relevant evidence was defined in LSA-R.S. 15:441 (repealed by 1988 La.Acts, No. 515, § 8) as "that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent." In questions of relevancy much discretion is vested in the trial court; such rulings will not be disturbed on appeal in the absence of a showing of manifest abuse of discretion. State v. Trosclair, 584 So.2d 270, 275 (La.App. 1st Cir.), writ denied, 585 So.2d 575 (La.1991).
Defendant's objection occurred during the testimony of Valerie Thompson. Ms. Thompson indicated that after she informed the police of defendant's involvement in the murder, she told her boyfriend, Roy Bell, that she had not told the police the truth. She claimed she wanted to see if she could "trust" Mr. Bell. She explained that Mr. Bell had been talking to other people about the case, and she wanted to see if he would tell other people that she had changed her story. During the testimony the prosecutor also established that Ms. Thompson was "scared" of Mr. Bell. On redirect, the prosecutor had Ms. Thompson identify two pictures which were taken of Ms. Thompson after an altercation with Mr. Bell when Mr. Bell broke her arm and injured her leg. The court overruled defendant's objection to the relevancy of the pictures.
We agree with defendant that the photographs were irrelevant and should not have been admitted. Although the state apparently was attempting to establish that Ms. Thompson changed her story out of fear of something Mr. Bell might do, the evidence established that Ms. Thompson's reason for changing her story was to determine if she could "trust" Mr. Bell. Ms. Thompson agreed with the prosecutor that she was afraid of Mr. Bell; but she did not indicate that this fear was her reason for telling Mr. Bell that she had lied to the police. Additionally, the injuries displayed in the pictures were inflicted approximately two to three months after Ms. Thompson *1008 told Mr. Bell she had lied, and there was no evidence that Mr. Bell had hurt Ms. Thompson similarly in the past. Thus, the pictures were irrelevant.
Although we find the trial court erred when it overruled defendant's objection, we also find the error is harmless. A trial error is harmless when a reviewing court is convinced that the error was harmless beyond a reasonable doubt. The state has the burden of demonstrating that the trial error did not contribute to the defendant's conviction. State v. Cage, 583 So.2d 1125, 1127 & 1128 (La.), cert. denied, ___ U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991). See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, 391 So.2d 421, 428 (La.1980).
We find no indication that the pictures added credibility to Ms. Thompson's testimony or otherwise contributed to the conviction. Indeed, admission of the pictures might have provided emphasis for the jury of Ms. Thompson's different stories to the police, thus becoming an indirect benefit to defendant. Thus, we find the error is harmless beyond a reasonable doubt. The assignment of error is meritless.
QUESTIONING DEFENDANT CONCERNING PRIOR VIOLENT ACTS
In assignment of error number eight, defendant asserts the trial court erred when it overruled defendant's objection to the state's asking defendant about previous violent acts. Defendant argues the evidence was "other crimes" evidence and inadmissible.
During the cross-examination of defendant, the state asked defendant if he had committed the following acts of violence: pointing a gun at Ernest Shields, trying to take Sadie Mae Hines somewhere against her will, threatening Paul Francois, and pulling a knife on Wallace McCarter. Defendant answered each question in the negative. Defense counsel initially did not object to the line of questioning, instead asking for a limiting instruction to inform the jury that when defendant denies the offense that means the allegations are not true. The court granted this request and instructed the jury not to draw any inferences from the prosecutor's questions if defendant denied the act. After a recess, defendant objected to the entire line of questioning as being improper impeachment with use of prior arrests. In making the objection, counsel indicated the assistant district attorney had been thumbing through a "big, thick file" when he asked the questions. The court overruled the objection, explaining that defendant had opened the door on direct examination by denying that he had committed any acts of violence in the past.
Initially, we note that defendant did not preserve this issue for appeal. A contemporaneous objection is necessary to preserve an issue for appellate review. See LSA-C.Cr.P. art. 841. An objection made after the evidence is before the jury comes too late. State v. Bretz, 394 So.2d 245, 251 (La.), cert. denied, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981). Defendant had answered each question before counsel objected, and the objection came after a recess. After the objection, the state did not continue further with the line of questioning. Additionally, defendant's initial objection, which came in the midst of the questioning, merely asked for a limiting instruction. Thus, defendant is barred procedurally from advancing this assignment of error on appeal.
Furthermore, although references to arrests and indictments and other criminal activity cannot be used for the purpose of impeachment, see LSA-R.S. 15:495 (repealed by 1988 La.Acts, No. 515, § 8), the state is not precluded from contradicting a defendant's testimony given on direct examination upon an issue which the defendant himself has brought into the case. See State v. Cotten, 438 So.2d 1156, 1162-63 (La.App. 1st Cir.1983), writ denied, 444 So.2d 606 (La.1984). As the trial court recognized, defendant "opened the door" to questioning about the acts of violence. On direct examination he denied ever carrying a weapon of any kind; his response was, "No sir," when his attorney asked him, "Have you ever confronted anybody *1009 with a weapon or robbed anybody or inflicted any sort of personal violence upon the person of any other?" Therefore, the prosecutor's questions did not constitute impermissible references to other crimes. See Cotten, 438 So.2d at 1163.
The assignment of error is without merit.
REFUSAL TO ALLOW DEFENDANT TO INTRODUCE TRANSCRIPT OF HIS STATEMENT
In assignment of error number nine, defendant contends the court erred when it refused to allow defendant to introduce a transcript of the taped statement defendant gave to the police. Relying upon the best evidence rule and the requirement that a confession be introduced in its entirety, defendant argues that the court's refusal to introduce the transcript deprived defendant of exculpatory information contained in the statement.
On cross-examination the prosecutor asked defendant if he had heard a gunshot on the day the victim was murdered. Defendant replied that he had not. In response the prosecutor referred defendant to the statement he gave to Detective Mike Sticker. The prosecutor implied that defendant had told the detective that he had heard the shot. However, defendant testified that he never told the officer he had heard the shot but instead told the officer that Mr. Robinson had told him that Mr. Robinson had heard the shot. Defense counsel then objected, arguing that the transcript of the statement did not support the prosecutor's questioning. Counsel asserted that he should be given a copy of the tape recording if it differs from the transcript. The court indicated that it wanted to listen to the recording, and it did so outside the presence of the jury.[12] After listening to the tape, the court concluded that defendant's statement could not be used as support for finding that defendant told the police that defendant heard a shot. When defense counsel indicated he wished to play the entire recording for the jury to corroborate defendant's testimony, the court refused and indicated that the quality of the recording was too poor to play the tape for the jury. However, the court agreed to instruct the jury. When the jury returned, the court instructed the jury as follows:
I had to ask you to leave the room because there was a question about the transcript of a taped statement given by the defendant in this case, which the prosecution wanted to use to indicate that he at some time, had told the police that he had heard a shot; I have now listened to the tape. It is of very poor quality. I was able to make out enough to be able to tell you that Mr. Williams made no such statement. However, because of the poor quality of the tape, I have sustainedwell, I have denied defense's request that it be played to the jury, because I think, overall, it would beit would be extremely difficult for you to gather anything from it. I will tell you, however, that the tape does not reflect that Mr. Williams made any inconsistent statement in the past about having heard a shot.
Prior to its repeal (with the adoption of the Louisiana Code of Evidence), LSA-R.S. 15:436 provided that "[t]he best evidence which from the nature of the case must be supposed to exist, and which is within a party's control, must be produced." Jurisprudence has stated that the best evidence of a tape recording is the unaltered tape. An accurate transcription of the tape would be better evidence than oral testimony based on a recollection of a witness to the conversation. See State v. Sterling, 444 So.2d 273, 281 (La.App. 1st Cir.1983). A decision about the audibility of a tape recording rests within the sound discretion of the trial court. State v. Hennigan, 404 So.2d 222, 236 (La.1981).
*1010 We have reviewed the transcript of the portion of the taped statement which was made by the court reporter as the recording was played in the courtroom; we find no abuse of the court's discretion in finding that the tape should not be played before the jury. Almost all of defendant's answers were listed by the reporter as being "inaudible"; several of the questions also were inaudible. Furthermore, because of the court's instruction to the jury, the corroborative information was presented to the jury.[13]
The assignment of error is without merit.
IMPROPER JURY INSTRUCTION
In the tenth assignment of error, defendant asserts the court erred when it instructed the jury that defendant could be presumed to intend the natural and probable consequences of his acts. Defendant argues this instruction shifted the burden of proof and implied that defendant had to prove he was not guilty.
The language cited by defendant, that a person could be presumed to intend the natural and probable consequences of his acts, is an impermissible jury instruction. See Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); State v. Heads, 385 So.2d 230 (La.1980); State v. Corley, 587 So.2d 193 (La.App. 3d Cir. 1991), writ denied, 590 So.2d 1199 (La. 1992). Such an instruction allows the jury to interpret the instruction as constituting either a burden-shifting presumption or a conclusive presumption. Sandstrom, 442 U.S. at 524, 99 S.Ct. at 2459.
However, this law has no application in the instant case. Although defendant's appellate counsel claims the instruction was given to the jury, the portion of the instruction quoted in defendant's brief does not include the instruction and has no application to this argument. We have reviewed the court's entire final instructions to the jury and have concluded that the court did not instruct the jury as defendant claims. Furthermore, we find no indication that defendant objected to the court's instruction. Under the authority of article 801 of the Code of Criminal Procedure, a defendant's failure to object to the trial court's instructions at a time when the court can cure the alleged error prevents him from raising the issue on appeal. Thus, defendant is barred procedurally from raising the issue on appeal.
On appeal, defendant also suggests the trial court improperly commented upon the evidence during the instructions to the jury. In the portion of the instructions quoted by defendant, the court mistakenly described the possible verdicts the jury could render on the second degree murder count as being guilty of second degree murder, guilty of manslaughter, and "guilty." The court promptly corrected itself to include the verdict of "not guilty." Because this issue goes beyond the assignment of error, we will not consider the merits of defendant's argument. In accord with the well-established jurisprudence of the Louisiana Supreme Court, this Court will not consider arguments which are neither assigned as error nor related to errors patent on the face of the record. State v. Williams, 319 So.2d 404, 405 (La. 1975); State v. Francis, 597 So.2d 55, 59 (La.App. 1st Cir.1992). Furthermore, even if defendant were not procedurally barred from having this argument considered, there would be no merit to his claim. A review of the transcript clearly reveals that the judge's failure to include "not guilty" as a possible verdict was an oversight which was corrected promptly.
The assignment of error is without merit.
DENIAL OF DUE PROCESS
In the eleventh assignment of error, defendant argues the cumulative impact of the numerous errors (which are described in the other assignments of error) requires reversal of his conviction even if no single error requires reversal. We have carefully reviewed each assignment of error and found no reversible error. Furthermore, the combined effect of the incidents complained of did not deprive defendant of the right to a fair trial. There is no cumulative *1011 prejudicial impact; nor is there a denial of due process. See State v. Copeland, 530 So.2d 526, 544-45 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Graham, 422 So.2d 123, 137 (La.1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983).
The assignment lacks merit.
PATENT ERROR
After reviewing this record, we have discovered a sentencing error patent on the face of the record. The trial judge did not give defendant credit for the time served when the sentence for armed robbery was imposed.
LSA-C.Cr.P. art. 880 requires the court to give defendant "credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence." Patent sentencing error occurs when the trial court fails to specify credit for time served. State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990). Accordingly, we amend the sentence for armed robbery to reflect that defendant is to be given credit for time served prior to execution of his sentence. See LSA-C.Cr.P. art. 882 A. Resentencing is not required. However, we remand the case and order the district court to amend the commitment and the minute entry of the sentencing to reflect that defendant is to be given credit for time served.
AFFIRM AND REMAND FOR CORRECTION OF SENTENCE.
NOTES
[1] The habitual offender bill sought enhancement of both counts of the instant indictment. However, habitual offender enhancement of more than one conviction obtained the same date arising out of a single criminal act or episode is not allowed. See State ex rel. Porter v. Butler, 573 So.2d 1106, 1109 (La.1991). Despite the error in the habitual offender bill, the trial court was careful to sentence defendant as an habitual offender on the armed robbery count only.
[2] In the thirteenth assignment of error, defendant requests that the record be checked for the existence of patent error. Such a request is unnecessary as this court routinely reviews all records for patent error. See, LSA-C.Cr.P. art. 920(2).
[3] In addition to the assignments or error advanced by counsel, defendant filed three pro se briefs. He provided additional arguments on ineffective assistance of counsel and insufficient evidence. He also advanced an additional assignment, that his prosecution for both second degree murder and armed robbery violated the protection against double jeopardy. At the trial level, a criminal defendant has no right to be both represented and to represent himself. See State v. McCabe, 420 So.2d 955 (La.1982); State v. Bodley, 394 So.2d 584 (La.1981); State v. Booker, 444 So.2d 238 (La.App. 1st Cir.1983), writ denied, 446 So.2d 1227 (La.1984). The appellate level should be no different.
[4] During a physical lineup, Mrs. Albanese selected defendant as being the driver of the car and later identified defendant in court as being this person.
[5] At the trial, Ms. Thompson was not asked if she ever saw a gun in defendant's possession or in the car during the trip.
[6] Defendant challenged sufficiency of the evidence in his twelfth assignment of error. We chose to discuss it first for the sake of clarity.
[7] When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817, 820 (La.1987). See also State v. Northern, 597 So.2d 48, 51 (La.App. 1st Cir.1992).
[8] Where the key issue raised by the defense is defendant's identification as the perpetrator, rather than whether or not the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984).
[9] Defendant argues that Mr. Robinson, who was placed at the scene by Valerie Thompson's testimony, could have done the shooting. If we were inclined to believe such an assertion, we find that it is not exculpatory for defendant, for defendant would have been involved in the incident as a principal. Furthermore, the guilty verdict rendered by the jury may not indicate definitively that the jury believed that Mr. Robinson began to walk home, but it does indicate definitively that the jury did not believe the defendant's hypothesis that Mr. Robinson did the shooting unaided by defendant.
[10] Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether or not a prima facie case has been made becomes moot. Hernandez, ___ U.S. at ___, 111 S.Ct. at 1866.
[11] Article 764 now provides that the exclusion of witnesses is governed by the Louisiana Code of Evidence. See LSA-C.Ev. art. 615.
[12] As the court listened to the recording, the court reporter transcribed the portion of the recorded statement which was played in the courtroom, along with comments made by counsel and the court during the playing of the tape. Neither the tape recording nor a copy of the transcript was introduced into evidence. However, because the court reporter included the portion essential to resolving the assignment of error, we are able to review the assignment of error.
[13] Defendant did not object to the court's instruction as being a comment on the evidence; nor does he argue on appeal that the court erred in giving the instruction.